Jessica T. Rosenberg
Melissa A. Barahona
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Phone: (212) 506-1700
Facsimile: (212) 506-1800
jrosenberg@kasowitz.com
mbarahona@kasowitz.com

*Attorneys for Plaintiff mGage, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MGAGE, LLC,<br><br>              Plaintiff,<br><br>              -v-<br><br>GLENN STANSBURY, TRACEY DREBY, DARREN METZGER, ROBERT MERKIN, RONALD SULAK, MOBIVITY, INC. and MOBIVITY HOLDINGS CORP.,<br><br>              Defendants. | Civil Action No.: 19-CV-01165 (CM)(KHP)<br><br>Hon. Colleen McMahon<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff mGage, LLC ("mGage" or the "Company") by its attorneys, Kasowitz Benson Torres LLP, as and for its complaint against defendants Glenn Stansbury, Tracey Dreby, Darren Metzger, Robert Merkin and Ronald Sulak, (the "Former Employees"), and Mobivity, Inc. and Mobivity Holdings Corp. (jointly, "Mobivity," and together with the Former Employees, "Defendants") alleges:

**<u>INTRODUCTION</u>**

1.      This action arises out of the Former Employees' misappropriation of trade secrets and confidential information – in anticipation of and after their coordinated resignations from – mGage, a global mobile marketing company, for the benefit of their new employer, Mobivity, in breach of their contractual obligations to mGage.

2.     Glenn Stansbury ("Stansbury"), the ringleader of this scheme, had served as mGage's Vice President of Sales since August 2015, and had led mGage's North American sales division to implement mGage's sales strategy and business.   Stansbury resigned on November 5, 2018, informing his supervisor Denisse Goldbarg ("Goldbarg"), mGage Global Chief Operating Officer, that he would leave the mobile messaging industry to pursue an opportunity in the master-agency side of the industry that is not competitive with mGage.  Based on this misrepresentation, mGage allowed Stansbury to stay on until December 1, 2018.

3.     Just a few weeks after his departure, in mid-January 2019, mGage learned Stansbury had lied and was working for a direct competitor, Mobivity, in direct violation of his six-month non-competition restriction.  mGage further learned that between August 24, 2018 and his last date of employment, Stansbury sent at least a dozen emails to his personal email account enclosing mGage's trade secrets and confidential information, including, without limitation mGage's revenue reports, customer pipeline lists, customer leads, employee commission information, and client contracts.

4.     Indeed, Stansbury's misappropriation of mGage's trade secrets and confidential information is staggering.  Records show Stansbury took the following files:

- Four revenue reports for mGage which contain information regarding mGage's actual sales, sales targets, budget, financial plans, and sales information for mGage's top 30 customers.  Stansbury emailed two of these reports to his personal email address on November 25 and November 29 – only days prior to his December 1, 2018 termination date.

- An excel file containing at least 217 leads of prospective mGage clients including client names and date of last contact.

- At least three contact lists for mGage's prospective and current customers containing customer names, positions, and contact information.  Stansbury emailed one of these lists to his personal email address on November 30 – his last day in the office.

2

5.     Tracey Dreby ("Dreby"), who worked with Stansbury both at a prior employer and then at mGage, resigned from mGage on November 14, 2018.  Like Stansbury, Dreby, who is bound by the six-month non-compete restriction, disavowed any intention to compete with mGage and informed the Company that she wanted "to focus on her family and have better work life balance."  Based on this representation, mGage permitted Dreby to remain employed with the Company through December 1, 2018.

6.     However, on the morning of November 27, 2018, while still working for mGage, Dreby claimed she could not attend an important team call.  Goldbarg proceeded with the call without Dreby.  mGage has since discovered that at or around the time she was purportedly unavailable to participate in this call, she was remotely accessing mGage's confidential client information and trade secrets from an IP address in Phoenix, Arizona near Mobivity's headquarters.  Dreby also accessed mGage's Business Prioritization and Customer Roadmap Files in the days prior to her termination in an effort to assist Mobivity.

7.     Indeed, records show Dreby accessed the following mGage highly confidential and proprietary documents without any legitimate business purpose:

- On November 21, 2018, Dreby accessed a "Business Prioritization" excel file containing detailed information regarding technical requests or changes to mGage's proprietary software by mGage's clients and information regarding the development, priority and progress of those requests;

- On November 30, her last day at mGage, Dreby accessed (i) "Customer Roadmap Requests" which is an excel file containing specific requests from mGage clients for mGage to add additional technical capabilities in this software and (ii) an excel file containing the projected volume of mGage's top 30 customers for the December 2018.

8.     Darren Metzger ("Metzger") and Robert Merkin ("Merkin"), who worked as Sales Directors for mGage also accessed confidential client files just days before their coordinated

resignations on November 5, 2018 (the same day as Stansbury) and on the morning of November 6, 2018, respectively.  In fact, the night before Merkin's resignation, he accessed a PowerPoint presentation describing mGage's proprietary mobile scratch game and an excel file containing the names, positions, and contact information for at least 240 mGage clients. After resigning, both Metzger and Merkin also joined Mobivity in violation of their non-competition restrictions.

9.     Ronald Sulak ("Sulak") who had been terminated in August 2018 was also part of the coordinated scheme to bring mGage's confidential information to Mobivity.  Indeed, records show Sulak accessed and downloaded hundreds of files containing mGage's confidential information a few days prior to his termination.

10.     Each of the Former Employees remain bound by contractual obligations explicitly set forth in their respective restrictive covenant agreements and the conduct described herein demonstrates that each of the Former Employees have violated those agreements.

11.     Specifically, the restrictive covenant agreements contain provisions requiring (i) non-disclosure, (ii) non-competition, (iii) non-solicitation, and (iv) return of mGage's property and information at the conclusion of employment.  The Former Employees have violated these post-employment obligations.

12.     Mobivity, which is also a mobile marketing and software company, has encouraged and facilitated the Former Employees' breaches.

13.     Mobivity stands to benefit significantly from the Former Employee's unlawful use of mGage's confidential files in their roles at Mobivity.

14.      Indeed, Mobivity's intentional interference with mGage's contractual rights have caused and will continue to cause mGage significant damages.

15.     Accordingly, and based on the facts as described herein, mGage brings this action seeking injunctive relief and damages in connection with violations of the Restrictive Covenant Agreements and other legal obligations.

**PARTIES**

16.     Plaintiff mGage, LLC is a limited liability company organized under the laws of the State of Delaware.  mGage's headquarters and principal place of business are in Fulton County, Georgia, located at 3424 Peachtree Road NE, Suite 400, Atlanta, Georgia 30326.  mGage maintains offices across the country, including in New York City, New York, located at 470 7th Avenue, 7th Floor, New York, New York 10018.  mGage's sole member is a Delaware limited liability company.

17.     Defendant Glenn Stansbury is a natural person who, upon information and belief, resides at 2748 NE 34th Street, Fort Lauderdale, Florida 33306.

18.     Defendant Darren Metzger is a natural person who, upon information and belief, resides at 2132 Long Ridge Road, Stanford, Connecticut, 06903.

19.     Defendant Robert Merkin is a natural person who, upon information and belief, resides at 222 Arrowood Way, Basking Ridge, New Jersey 07920.

20.     Defendant Tracey Dreby is a natural person who, upon information and belief, resides at 174 Durham Road, Newtown, Pennsylvania 18940.

21.     Defendant Ronald Sulak is a natural person who, upon information and belief, resides at 2121 Stillwater Place, Wilmington, North Carolina 28405.

22.     Defendant Mobivity Inc. is a Nevada business corporation whose principal place of business and headquarters is located at 55 North Arizona Place, Suite 310, Chandler, Arizona 85225.

23.     Defendant Mobivity Holdings Corp. is a Nevada business corporation whose principal place of business is located at 55 North Arizona Place, Suite 310, Chandler, Arizona 85225.

## JURISDICTION AND VENUE

24.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because mGage asserts federal claims under the Defend Trade Secrets Act ("DTSA").  The Court also has supplemental or pendant jurisdiction over the Company's remaining claims against Defendants, pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal question claims.  In addition, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over Stansbury, Metzger, Sulak, and Merkin by virtue of their consent to be sued in any federal court located in the State of New York.  This Court has personal jurisdiction over all the Defendants because the causes of action asserted herein arise from Defendants' transactions of business in New York and/or tortious acts within New York.

26.     Venue in the Southern District of New York is appropriate under 28 U.S.C. § 1391 as a substantial part of the actions giving rise to the claims herein occurred in this District.

## FACTS

### A.  mGage's Business

27.     mGage is a global mobile marketing company that partners with businesses around the world to provide personalized marketing messages to consumers' mobile devices through SMS, MMS, Push, and OTT messaging.

28.     mGage offers its clients access to its proprietary software and platform including its "Campaign Management Tool," a cloud-based enterprise level messaging platform to help businesses create better customer experiences with SMS, MMS, Push, and OTT messaging.

29.     The proprietary Campaign Management Tool provides mGage clients with reporting and analytical data to track the success of their marketing efforts.

## B.   mGage's Trade Secrets and Confidential Information[1]

30.     mGage invests a substantial amount of time and resources in the development of its client relationships and proprietary software to maintain its competitive advantage.  For example, mGage's Campaign Management Tool allows brands to develop, test, and manage their marketing campaigns.  This software is unlike any other software currently in the industry, and mGage continually updates and develops this software to its clients ever-changing business needs to offer its clients unique technical capabilities and analytical data.

31.     Files associated with the Campaign Management Tool are highly confidential trade secrets of mGage.

32.     mGage also invests substantial resources into the development of its existing and prospective client relationships.  mGage's strong goodwill with its customers is developed and maintained through its Account Managers, Directors, and Sales Directors who are tasked with identifying and cultivating relationships with mGage's clients.

33.     mGage's Account Managers and Directors are tasked with maintaining and developing mGage's existing customer relationships on mGage's behalf.  In the scope of their work, Account Managers and Directors are permitted to gain access to portions of mGage's Confidential Information, such as customer contact information, actual and projected sales data,

---

[1] The term "Confidential Information" is defined herein.  *See* ¶ 43 n.2, infra.

actual and projected revenue for the Company, and information regarding the development of the Company's proprietary software and the customers' specific technical needs.

34.     mGage's Sales Directors identify prospective customers that have mobile marketing needs.  The Sales Directors cannot merely consult a trade periodical or other public document or source for a list of names and contact information for the correct point of contact at prospective customers, which are typically large business organizations.  Instead, mGage spends months, if not longer, methodically working through its process to identify a contact to target.  In this process, mGage collects, analyzes, catalogues, and utilizes certain confidential client information to give the Company a competitive advantage in pursuing and obtaining business from clients.  Because this information is confidential and highly valued, mGage secures this information on its protected network and its access-controlled offices.

35.     mGage's Account Directors, Managers, and Sales Directors are essential to creating and maintaining mGage's reputation and goodwill with its existing and prospective clients.  During their employment with mGage, these employees become intimately familiar with mGage's marketing and sales strategies and are the primary contacts for the Company's clients.  Moreover, they must cultivate relationships with existing and prospective customers to understand each customers' marketing needs and to develop trust.  This requires sustained contact with the customer and engagement.

36.     mGage spends hundreds of thousands of dollars and hundreds of hours of personnel time developing these relationships and earning and maintaining customer goodwill.  For example, mGage's Account Directors, Managers, and Sales Directors are required to frequently call, meet, and invite existing and prospective customers to events and trade shows and keep them apprised of updates and modifications to mGage's software.  Because mGage's employees have the most

direct contact with its existing and prospective customers, mGage employs various security measures to prevent their employees from taking, to mGage's competitors, the relationships they have developed for mGage and the confidential information underlying those relationships.

### C.  mGage Protects its Confidential Information

37.     mGage takes reasonable measures to protect its trade secrets, confidential information and other legitimate business interests.  mGage employees are instructed to treat as confidential, among other things, its customer lists, sales data, financial reports, lead lists, Business Prioritization reports, Customer Roadmap files and information regarding the development of its proprietary software.

38.     Additionally, mGage requires its employees who have access to its Confidential Information and/or who are in positions to impact the Company's customer goodwill to abide by certain non-competition, non-solicitation, and non-disclosure covenants, and to return mGage's property and information at the conclusion of their employment.

39.     Moreover, mGage requires its prospective clients to sign master service agreements before they are provided with any confidential mGage data, such as confidential pricing information.

40.     mGage also maintains access-controlled offices, where visitors are restricted and limited with respect to their ability to view physical documents and electronic information.

41.     mGage further protects its trade secrets and Confidential Information by storing its data on secure servers and software with restricted access.  All mGage employees are trained to abide by the Company's security procedures and instructed not to use their personal email accounts for business purposes.  The Company's employee handbook further prohibits employees from accessing their personal email accounts at its offices.

42.     Additionally, Confidential Information stored on mGage's system is restricted to mGage personnel who have legitimate reasons to access the information.  For example, Sales Directors do not have full access to mGage's customer contracts and/or sales leads and are permitted only to access the prospective business leads assigned to them by their superiors.

**D.  mGage Requires Employees to Sign Restrictive Covenant Agreements**

    **a.  mGage Requires Employees To Sign Restrictive Covenant Agreements**

43.     In order to further protect its trade secret and confidential information, mGage requires all employees to sign a restrictive covenant agreement (the "Restrictive Covenant Agreement").  The Restrictive Covenant Agreement contains an express provision for the protection of mGage's trade secrets and Confidential Information.[2]  Specifically Section 2.1 of the Restrictive Covenant Agreement states:

> "Employee acknowledges that in the course of his or her employment with the Company, Employee will have access to Confidential Information all of which will be made available to Employee only in strict confidence.  During Employee's employment with the Company and following the termination of such employment, Employee (i) shall treat all Confidential Information as strictly confidential; (ii) shall use and/or make copies of Confidential Information only as authorized by the Company within the scope of Employee's employment with the Company; (iii) shall not, directly or indirectly, disclose, disseminate, publish or reveal any Confidential Information to any third Person without the Company's prior written

---

[2]   The Restrictive Covenant Agreement defines "Confidential Information" as "all information or materials of a confidential or proprietary nature which Employee receives during the course of his or her employment with the Company or through the use of any of the Company's facilities or resources, including, without limitation, the following: (i) all information or materials (whether in paper or electronic form or otherwise stored or recorded) relating to the business or operations of the Company or any of its subsidiaries or Affiliates, including, without limitation, business plans and strategies, business processes and procedures, financial information, marketing plans and studies, cost information, price information, quoting procedures, customer and supplier lists, contracts with third parties, purchasing information, correspondence, computer system passwords, employee records, compensation paid to employees and other terms of employment; (ii) all information or materials relating to any software or program, invention or technology of the Company or any of its subsidiaries or Affiliates, including, without limitation, source and object codes, algorithms, schematics, flowcharts, logic diagrams, designs, coding sheets, techniques, specifications, technical information, test data, know-how, worksheets and related documentation and manuals; (iii) all other information or materials relating to the business or activities of the Company or any of its subsidiaries or Affiliates which are not generally known to the public (including, without limitation, any information that is marked 'Confidential' or 'Proprietary'); and (iv) all information or materials received by the Company or any of its subsidiaries or Affiliates from any third party subject to a duty to maintain the confidentiality thereof and to use such information or materials only for a certain limited purposes.

> consent; and (iv) shall take all reasonable precautions to prevent the inadvertent or accidental disclosure of any Confidential Information.  Employee acknowledges that any unauthorized disclosure of Confidential Information will damage the Company's business."

(the "Confidentiality Provision").

44.     mGage's client and financial information, including, without limitation, information contained in prospective customers and/or pipeline lists, its financial records showing its pricing, revenues, profits, and client sales records or history, and client contact information, all constitute Confidential Information as defined in the Restrictive Covenant Agreement.  mGage compiled and created this information over many years at substantial effort and expense and is not publicly available.  To best protect this information, which provides mGage with a competitive advantage in the industry, mGage takes reasonable steps to protect its secrecy as described herein.

45.     The Restrictive Covenant Agreement also require employees to return all of mGage's Confidential Information, property, information, and other materials upon termination of employment.  Specifically Section 2.2 states:

> "Upon termination of Employee's employment with the Company or at any time upon the Company's request, Employee will immediately deliver to the Company: (i) all Confidential information in his or her possessions (including any copies thereof) and (ii) all correspondence, manuals, letters, notes, notebooks, reports, programs, plans, proposals, financial information and any other document concerning the business or operations of the Company or any of its subsidiaries or Affiliates."

(the "Return of Materials Provision").

46.     The Restrictive Covenants Agreement contains an express provision for the protection of mGage's trade secrets, in which employees agree not to use or disclose any Confidential Information at any time during or after employment without the Company's prior written consent.

11

**b. The Former Employees Are Bound by The Restrictive Covenant Agreements**

47.     As set forth herein, the Former Employees each entered into Restrictive Covenant Agreements with mGage whereby they agreed to be bound by certain non-solicitation and non-disclosure covenants as conditions of their employment.[3]  Specifically, the Restrictive Covenant Agreements contain provisions requiring (i) non-disclosure, (ii) non-competition, (iii) non-solicitation, and (iv) return of mGage's property and information at the conclusion of their employment.   mGage has discovered that the Former Employees have violated these post-employment obligations.

48.     Pursuant to the Restrictive Covenant Agreements, the Former Employees agreed not to perform services for a Competitive Entity in areas which the Company conducts business for a period of six (6) months (the "Non-Competition Provision").

49.     As defined in the Employment Agreements, "Competitive Entity" includes any person or entity engaged in "delivering SMS, MMS, Push, or other messages or notifications or offering a platform, reporting or other analytics services, in any manner similar to such services as are or may be offered by the Company from time to time."

50.     Mobivity is a "Competitive Entity" as defined by the Restrictive Covenant Agreements.

51.      The Former Employees also agreed that for a period of six (6) months, they would not directly or indirectly, on their own behalf or on behalf of any other person or entity, solicit any mGage employee or actual or prospective mGage clients with whom they provided services to

---

[3]  The respective Restrictive Covenant Agreements of the Former Employees are further defined herein and attached to this Declaration as Exhibits A - E.  Georgia law governs Dreby's Restrictive Covenant Agreement.  New York law governs the Restrictive Covenant Agreements for Stansbury, Metzger, Merkin and Sulak.

and/or identified as a business prospect during their employment with the Company (the "Non-Solicitation Provision").

52.     In addition to the promises above, the Former Employees agreed that any breach of the restrictive covenants above would cause mGage irreparable injury and that the restrictions contained therein were reasonable.

53.     The Former Employees also agreed that the Company would be entitled to attorneys' fees and costs if it prevailed in litigation seeking to enforce the provisions contained in the Employment Agreement (the "Attorneys' Fees Provision").

### c.  The Stansbury Agreement

54.     Stansbury began his employment with mGage on or about August 24, 2015,[4] and worked for the Company as Vice President of Sales until December 1, 2018.

55.     On August 24, 2015, Stansbury entered into mGage's Restrictive Covenant Agreement titled "Agreement on Ideas, Inventions, and Confidential Information" (the "Stansbury Agreement").  A true and correct copy is attached hereto as Exhibit A.

56.     As the Vice President of Sales, Stansbury led mGage's North American sales division and was responsible for developing and implementing mGage's sales strategy and business.  Stansbury's role at mGage exposed him to mGage's trade secrets and Confidential Information regarding the nature and structure of mGage's business, its mobile marketing and sales strategies, and its financial records, including its pricing and profitability models.  He also had access to the client and account information of his direct reports, including, but not limited to,

---

[4]  Except for Merkin, all of the Former Employees worked for mGage prior to its acquisition by TBC Holdings, a predecessor to mGage's corporate parent, Vivial, Inc.  The effective date for the Former Employees' (except for Merkin) employment with mGage as a TBC Holdings owned, and later Vivial owned, entity was in or around August 24, 2015 and they each were required to sign an Agreement on Ideas, Inventions, and Confidential Information as a condition of their employment at that time.  Merkin signed this Agreement in February 2016 in connection with the commencement of his employment.

actual and potential customer information and lists, customer preferences, billing rates, pricing practices, and contract expiration dates.  Dreby, Metzger, Merkin, and Sulak reported to Stansbury.

57.     Stansbury originally worked out of mGage's New York City office, but subsequently began to work remotely from his home in Florida.  He travelled frequently in connection with his duties.

58.     Stansbury resigned from mGage on November 5, 2018, and his resignation was effective as of December 1, 2018.

### d.  The Dreby Agreement

59.     Dreby began her employment with mGage on or about January 1, 2016, and worked for the Company as Lead Account Director until December 1, 2018.   Dreby also entered into an Agreement on Ideas, Inventions, and Confidential Information (the "Dreby Agreement") dated August 24, 2015 (the "Dreby Agreement").[5]  A true and correct copy of the Dreby Agreement is attached hereto as Exhibit B.

60.     As Lead Account Director, Dreby was the primary business interface for active customer accounts in mGage's North America sales division.  Dreby managed a team of four Account Directors during her tenure at mGage and was tasked with building and maintaining mGage's relationships with its customers.  In this role and through her relationship with mGage clients, Dreby had access to mGage's trade secrets and other Confidential Information to assist her with maintaining mGage's customer relationships and responding to their business needs.  Such information included, without limitation, client contact information, client contracts, pricing

---

[5]  All of the Former Employees were required to sign an Agreement on Ideas, Inventions, and Confidential Information as a condition of their employment.  Except for Merkin, each of the Former Employees executed this agreement on or around August 24, 2015 in connection with the acquisition of mGage by TBC Holdings, a predecessor to Vivial.  The Former Employees' effective date for their employment commenced at a later date following the closing of this acquisition.  Merkin signed this agreement in February 2016.

information, actual and projected sales data, and information regarding the development of mGage's proprietary software so she could inform her reports and clients of upcoming capabilities.

61.     Dreby worked remotely from her home in Pennsylvania during her employment with mGage.  Dreby would occasionally work out of the New York City office depending on business and/or client needs.  The client accounts Dreby oversaw are located throughout the United States.

62.     Dreby resigned from mGage on November 14, 2018, and her resignation was effective as of December 1, 2018.

   **e.  The Merkin and Metzger Agreements**

63.     Metzger began his employment with mGage on or about January 1, 2016, and resigned from the Company on November 5, 2018.   Metzger also entered into an Agreement on Ideas, Inventions, and Confidential Information (the "Metzger Agreement") dated August 24, 2015.  A true and correct copy of the Metzger Agreement is attached hereto as Exhibit C.

64.     Merkin began his employment with mGage on or about February 15, 2016, and resigned from the Company on November 6, 2018.   Merkin also entered into an Agreement on Ideas, Inventions, and Confidential Information (the "Merkin Agreement") dated February 15, 2016.  A true and correct copy of the Merkin Agreement is attached hereto as Exhibit D.

65.     As Sales Directors, Metzger and Merkin were considered "hunters" within mGage and responsible for building a pipeline of new customers by connecting with prospects through calls, emails, meetings, and industry events.  In these roles and through their relationship with mGage prospective clients, Metzger and Merkin had access to mGage's trade secrets and other Confidential Information to assist them in pitching mGage's business and marketing solutions to potential clients.  Such information included, without limitation, client contact information, leads of prospective clients, and pricing information.

66.     Metzger and Merkin worked out of mGage's New York City office during their employment at mGage.  The clients they serviced on behalf of mGage are located throughout the United States.

**f.  The Sulak Agreement**

67.     Sulak began his employment with mGage on or about January 1, 2016, and worked for the Company as a Sales Director until August 3, 2018.   Like Metzger and Merkin, Sulak was responsible for building a pipeline of new customers by connecting with prospects through calls, emails, meetings and industry events.   In this role, he had access to mGage's trade secrets and other Confidential Information to assist him in pitching mGage's business and marketing solutions to potential clients.   Such information included, without limitation, client contact information, leads of prospective clients, and pricing information.

68.     mGage required Sulak to abide by certain confidentiality, non-solicitation and non-competition covenants in order to protect mGage's investment in its client relationship and the Confidential Information Sulak had access to by virtue of his position.   At the time he joined mGage, Sulak entered into an Agreement on Ideas, Inventions, and Confidential Information (the "Sulak Agreement").   A true and correct copy of the Sulak Agreement is attached hereto as Exhibit E, and is incorporated herein by reference.

69.     Sulak worked out of mGage's New York City office, but subsequently began to work remotely following his move to North Carolina.   The clients Sulak serviced are located throughout the United States.

70.     mGage terminated Sulak on August 3, 2018 for poor performance.

**E.  The Former Employees Each Breached the Restrictive Covenant Agreements Multiple Times During and After Their Employment with mGage**

71.    Very recently, mGage discovered that the Former Employees began to work for Mobivity, a competitor to mGage, in violation of the Restrictive Covenant Agreements.  mGage agreed to waive Sulak's noncompetition covenant in connection with his Severance Agreement. mGage thus is not claiming that Sulak's employment with Mobivity directly violates his Agreement.   However, as discussed herein, Sulak has violated other contractual and legal obligations to mGage.

72.    Like mGage, Mobivity is a mobile marketing and software company that provides its customers with the ability to deliver targeted marketing through SMS, MMS, and push notifications.  Mobivity also offers its customers a platform to track purchase history.  Mobivity currently competes with mGage in the retail sector, and both companies compete for the business of restaurant and retail brands.  According to Mobivity's website Stansbury is currently Mobivity's Vice President, Sales and Account Management.   Mobivity also currently employs Dreby, Metzger, Merkin, and Sulak.

**a.  Stansbury Solicits Metzger, Dreby, and Merkin to Resign from mGage to Join Mobivity in Violation of the Non-Solicitation Provision**

73.    Upon information and belief, Stansbury, at Mobivity's behest, solicited, encouraged and caused Dreby, Merkin, and Metzger to resign from mGage and join Stansbury in working for Mobivity, mGage's competitor, in breach of the Non-Solicitation Provision. Stansbury's solicitation of Dreby, Merkin, and Metzger directly benefits Mobivity as Mobivity is now able to utilize mGage's Confidential Information and the goodwill these employees formed with mGage's current and prospective clients to solicit the Company's business.

74.     Upon information and belief, Mobivity and Stansbury coordinated a plan for the Former Employees to resign at the same time while allowing Stansbury to remain at mGage to misappropriate its Confidential Information and trade secrets on Mobivity's behalf.

75.     Stansbury put this plan into action on November 5, 2018.  Stansbury resigned at approximately 1:00 p.m. on November 5.  At the time of his resignation, Stansbury informed mGage that he wanted to "do something different" and that he planned to leave the mobile messaging industry to pursue an opportunity in the master agent industry in which mGage does not compete.  Based on these representations, mGage permitted Stansbury to remain employed with the Company through December 1, 2018, which allowed Stansbury to have continued access to mGage's employees and Confidential Information.

76.     On November 5, 2018, the same day Stansbury resigned, Stansbury proceeded to provide Metzger and Merkin with "corrective action plans" to address their poor performance.

77.     Denisse Goldbarg, Stansbury's superior, was surprised at Stansbury's sudden notification that he planned to give the written notices to Metzger and Merkin on this date.  Indeed, although Ms. Goldbarg asked Stansbury to address Metzger's and Merkin's performance issues on several occasions prior to this date, he continually seemed to drag his feet and failed to engage in these discussions with them.

78.     However, on November 5, 2018, Stansbury emailed Metzger and Merkin at approximately 2:35 p.m. to notify them of the corrective action plans which required Metzger and Merkin to meet certain sales goals within thirty (30) days.

79.     In response to receiving the "corrective action plan" from Stansbury, Metzger resigned on November 5 (the same day as Stansbury) and Merkin resigned on the morning of November 6.  The coordinated resignations were similar in that each expressed outrage and dismay

at having received such a warning.  Stansbury forwarded these resignations to Jeanne Hilley, mGage's VP Human Resources, and claimed that he would reach out to them to discuss their resignations.

80.    Upon information and belief, Stansbury engaged in these efforts to mislead mGage's management into believing that he remained loyal to mGage despite his own earlier resignation so that mGage would allow him to remain at mGage where he could continue to access and misappropriate its Confidential Information for the benefit of his new employer, Mobivity. Indeed, after Stansbury left mGage, mGage learned that he took Metzger and Merkin out to an expensive dinner just week prior to their departures.

81.    Dreby resigned from mGage on November 14, 2018.  Like Stansbury, Dreby disavowed any intention to compete with mGage and informed the Company that she wanted to resign to "to focus on her family to focus on her family and have better work life balance."  Based on these representations, mGage permitted Dreby to remain employed with the Company through December 1, 2018, which allowed Stansbury to have continued access to mGage's Confidential Information.  Upon information and belief, Dreby and Stansbury agreed to resign in a manner that would allow them to stay at mGage together in order to access mGage's Confidential Information and trade secrets.

82.    Upon information and belief, Mobivity had offered and the Former Employees had agreed to join Mobivity prior to the time of their resignations.  Indeed, mGage records show that Stansbury had a Mobivity email address as early as November 30, 2018 and Metzger had a Mobivity email address as early as November 26, 2018.

**b.   mGage Discovers the Former Employees Orchestrated a Coordinated Scheme
to Misappropriate mGage's Confidential Information**

83.    Upon recently learning of the Former Employees' association with Mobivity,
mGage quickly investigated the Former Employees' conduct and activities in the lead-up to their
resignations to attempt to understand the full scope of their unlawful actions and the extent to
which these actions damaged the Company and could continue to do so.  As a result of this
investigation, mGage learned that Mobivity and the Former Employees engaged in a coordinated
scheme to misappropriate its Confidential Information and trade secrets and unlawfully compete
with mGage.

84.    Stansbury's misappropriation of mGage's Confidential Information began months
prior to his departure.  Upon information and belief, Stansbury began to misappropriate mGage's
Confidential Information at Mobivity's instruction shortly after he agreed to join Mobivity.

85.    Between August 24, 2018 and his last date of employment at mGage, Stansbury
sent at least thirteen emails to his personal account enclosing mGage's trade secrets and
Confidential Information including, without limitation, mGage's revenue reports, customer
pipeline lists, customer leads, commission information for mGage employees, and client contracts.
The information Stansbury misappropriated includes, without limitation:

- Four revenue reports for mGage which contain information regarding mGage's actual
sales, sales targets, budget, financial plans, and sales information for mGage's top 30
customers.  Stansbury emailed two of these reports to himself on November 25 and
November 29 – only days prior to his December 1 termination date.

- An excel file containing at least 217 leads of prospective mGage clients including client
names and date of last contact.

- At least three contact lists for mGage's prospective and current customers containing
customer names, positions, and contact information.  Stansbury emailed one of these
lists to himself on November 30 – his last day in the office.  Indeed, Stansbury duped
mGage into allowing him to regain access to its system on November 30 by claiming
he needed the contact information for his friends and family that he stored in his mGage

20

account.  mGage later discovered, however, that Stansbury downloaded contacts for mGage's customers and prospective customers at this time.

86.     In addition to the above information, mGage discovered that Stansbury misappropriated two excel files containing information regarding mGage's customers.  One of the files Stansbury misappropriated included a full 2019 pipeline list which contained detailed information for over 500 prospective customers, including names and contact information, stage of the sales efforts, products of interest to the customers, and amount of expected revenue.  With this information, Stansbury and Mobivity have the ability to immediately contact the prospective customers and undercut mGage's pricing model.

87.     mGage also uncovered that Dreby, Metzger, and Merkin each accessed and/or emailed mGage's Confidential Information to their personal accounts around the times of their departures including, without limitation:

- On November 2, 2018, three days before his planned resignation, Metzger accessed an excel file containing the actual and forecasted 2018 sales data for forty mGage clients;

- On November 3, 2018, Dreby accessed an excel file containing the planned and projected use of MMS services for 35 mGage clients;

- On November 5, 2018, the night before his planned resignation, Merkin accessed a PowerPoint presentation describing mGage's proprietary mobile scratch game and an excel file containing the names, positions, and contact information for at least 240 mGage clients;

- On November 21, 2018, Dreby accessed a "Business Prioritization" excel file containing detailed information regarding technical requests or changes to mGage's proprietary software by mGage's clients and information regarding the development, priority and progress of those requests;

- On November 30, her last day at mGage, Dreby accessed (i) "Customer Roadmap Requests" which is an excel file containing specific requests from mGage clients for mGage to add additional technical capabilities in this software and (ii) an excel file containing the projected volume of mGage's top 30 customers for December 2018.

88.     Significantly, Dreby's misappropriation was not limited to information about mGage's customer information for use in her future marketing efforts.  Dreby's misappropriation of the Business Prioritization and Customer Roadmap Requests files directly impacts mGage's development of its priority Campaign Management Tool.   As described herein, mGage's Campaign Management Tool offers mGage a competitive advantage in the industry as it allows its customers to manage and test the effectiveness of their desired marketing campaigns.  mGage constantly works with its software engineers to continuously develop this software and respond to customers' requests and business needs.

89.     The Business Prioritization and Customer Roadmap files Dreby misappropriated contain highly proprietary information concerning mGage's software development and will allow Mobivity to obtain information regarding mGage's development of this tool, the stages of that development, and the features most requested by its customers.  This is some of the most sensitive trade secret data mGage possesses. Dreby had no valid business reason for accessing this information, particularly in light of the fact that she had already tendered her resignation.

90.     Moreover, Dreby's access of the excel file containing the planned and projected use of MMS services of mGage's clients provides Dreby with a roadmap of customers to immediately contact.

91.     Sulak also improperly accessed mGage's Confidential Information.  As mGage uncovered, Sulak downloaded hundreds of files containing mGage's Confidential Information days prior to his termination.

92.     All of the information misappropriated by the Former Employees related to mGage's business that is secret and of value, including, without limitation: (i) details regarding mGage's clients, including pricing information, client contact information, date of last contact,

and products used by its customers; (ii) leads for customers with whom mGage intended to conduct business; (iii) mGage's financial information such as revenue sales targets, budgets, actual revenue; and (iv) details regarding the development of mGage's proprietary software.  Such information was compiled and created over many years at substantial effort and expense and is not publicly available, and mGage takes reasonable steps to protect its secrecy as described herein.

### c.  The Former Employees Use of mGage's Confidential Information to Compete with mGage and Solicit its Clients

93.     The Former Employees are all currently employed by Mobivity.  In their capacity as Mobivity employees, the Former Employees are selling or attempting to sell mobile marketing solutions to the same clients and prospective clients that they serviced during their tenure at mGage.  Upon information and belief, in furtherance of these objectives, the Former Employees have utilized the trade secret and Confidential Information they misappropriated from mGage to more effectively, and unlawfully, target mGage customers on behalf of Mobivity.

94.     Further, the Former Employees' unlawful competition through the actual and future use of mGage's trade secrets and Confidential Information, in breach of their Restrictive Covenant Agreements will cause significant harm to mGage due to the Former Employees' substantial knowledge of the Company's customers and clients, including several key accounts, and their training in the Company's confidential sales methods and strategies.

95.     As a result of the Former Employees' misappropriation of mGage's trade secrets, the Company has and will continue to suffer irreparable harm in the form of loss of goodwill, exposure of its trade secrets and resulting loss of competitive advantage, among other things. Moreover, as a direct consequence of the Former Employees' wrongful conduct, mGage has incurred substantial expense to enforce the Restrictive Covenant Agreements.

96.     On or about January, 23, 2019, mGage sent cease and desist letters to each of the Former Employees demanding that they cease violating their respective agreements and demanding the return of mGage's Confidential Information (the "Demand Letters").   Only Mr. Sulak responded claiming he would abide by the Restrictive Covenant Agreement.   However, Mr. Sulak did not return any Confidential Information to mGage.   The other four Former Employees ignored the letters.

**F.  Mobivity's Knowledge of the Restrictive Covenant Agreements, Improper Poaching, and other Wrongful and Tortious Actions**

97.     Pursuant to the Restrictive Covenant Agreements, the Former Employees are bound by valid and enforceable agreements that, among other things: (i) prohibit the Former Employees (other than Sulak) from working for mGage's competitors, such as Mobivity; (ii) bar the Former Employees from soliciting customers or clients of mGage that the Former Employees served during their employment with the Company; (iii) prevent the Former Employees from soliciting other employees of mGage to terminate their employment with mGage; (iv) prohibit the Former Employees from using, disclosing, or exploiting mGage's confidential business information; and (v) require the Former Employees to return all information and materials to mGage immediately upon the termination of their employment.

98.     Upon information and belief, Mobivity was aware that the Former Employees were bound by these contractual obligations at the time they hired the Former Employees.   Moreover, by letter dated January 23, 2019, mGage's counsel informed Mobivity of the Former Employees obligations under the Restrictive Covenant Agreements, and demanded that Mobivity cooperate with mGage to prevent any further harm by January 29, 2019.   Mobivity failed to take any action by this date, and simply responded on January 30, 2019 that it would provide a response at "a later date."   No later further response has been received.

99.     Upon information and belief, Mobivity has instructed the Former Employees that they do not need to comply with their contractual obligations to mGage.

100.    mGage has not authorized any of the Former Employees to possess, use, disclose, or exploit its confidential business information during their employment at Mobivity or at any other time.

101.    Upon information and belief, the Former Employees have used and are using mGage's confidential business information to conduct business for Mobivity and to solicit mGage's current and prospective clients to do business with Mobivity in violation of their Restrictive Covenant Agreements.

102.    Significantly, the Former Employees have taken steps to keep their illegal activities hidden from disclosure.  Indeed, the Former Employees hid their current employment with Mobivity by, among other things, informing mGage that they were going "to do something different" or "focus on family and have a better work life balance," and not updating their LinkedIn profiles to reflect their current place of employment.  Upon information and belief, the Former Employees have taken these actions in concert with Mobivity to cover up the illegal nature of their and Mobivity's activities.

103.    Knowing of the restrictive covenants in the Former Employees' Restrictive Covenant Agreements, hiring the Former Employees, encouraging the Former Employees to solicit mGage's current and prospective clients using mGage's confidential and trade secret information, and assisting the Former Employees in covering up their illegal actions, Mobivity has engaged and is engaging in unfair competition that is contrary to honest business practices.

104.    As a direct consequence of Mobivity's wrongful conduct, mGage has suffered damages in the form of actual loss of customers, exposure of its Confidential Information and trade

secrets and resulting loss of competitive advantage, and loss of the experienced Former Employees, including its investment in the Former Employees' training and damage to the goodwill and relationships that the Former Employees have built with mGage's customers.

## COUNT I
### Misappropriation of Trade Secrets Under the DTSA – 18 U.S.C. §§ 1832 and 1836
### (Against all Defendants)

105.   mGage adopts and realleges the allegations contained in paragraphs 1- 104 above as if fully set forth herein.

106.   mGage operates its business in interstate commerce across the United States.

107.   As set forth above and upon information and belief, the Former Employees improperly retained mGage's trade secret and Confidential Information after their employment relationships with mGage ended for the benefit of Mobivity.  The trade secrets misappropriated by the Defendants included information concerning methodologies and market research, information regarding mGage's client-related information, and other confidential and proprietary information in violation of the Restrictive Covenant Agreements.  This and other information mGage believes the Defendants misappropriated contained confidential business and/or financial information, listing of customer names, addresses, and telephone numbers, and/or other information relating to mGage's business that is secret and of value.

108.   The above-documents qualify as "trade secrets" under the DTSA, as defined under 18 U.S.C. § 1839(3).  Each employee of mGage signs an agreement prohibiting use and disclosure of such trade secrets outside of the Company and demanding their return upon termination of employment.  Such information required substantial resources, time and investment by mGage to create, collect and/or develop, and it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means.  The

Former Employees have used, are using, and inevitably will continue to use mGage's trade secrets on behalf of Mobivity unless enjoined.

109.    The Defendants actions described herein constitute a willful and malicious misappropriation of mGage's trade secrets under 18 U.S.C. § 1836(b)(2).

110.    The Former Employees' misappropriation of mGage's trade secrets is causing, and threatens to continue causing, mGage to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its investment in its trade secrets. This harm cannot be adequately remedied at law and requires permanent injunctive relief.

111.    Upon information and belief, the Former Employees have used mGage's trade secrets and Confidential Information to compete with mGage and are continuing to do so.

112.    mGage is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs, and expenses.

113.    Because the Former Employees' DTSA violations have been willful and malicious, mGage is entitled to exemplary damages of no more than twice the amount of damages for any actual loss and any unjust enrichment.

114.    As such, mGage demands judgment against the Defendants for their violations of the DTSA in the form of compensatory and exemplary damages, permanent injunctive relief, prejudgment interest, an award to mGage of reasonable attorneys' fees, and costs pursuant to both the Restrictive Covenant Agreements and 18 U.S.C. § 1836(b)(3)(D), and such other relief as the Court deems just and proper.

## COUNT II
## Misappropriation of Trade Secrets under New York State Common Law
### (Against all Defendants)

115.    mGage adopts and realleges the allegations contained in paragraphs 1-114 above as if fully set forth herein.

116.    The documents and information described herein that were misappropriated by the Former Employees qualify as "trade secrets" under New York law.

117.    As expressly acknowledged in the Restrictive Covenant Agreements, mGage considers these items to be confidential and proprietary trade secrets, and it has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information.

118.    The Former Employees improperly retained documents and information containing mGage's trade secrets in violation of the Restrictive Covenant Agreements.

119.    The Former Employees brought mGage's trade secrets and Confidential Information to their new employer Mobivity.

120.    Upon information and belief, the Former Employees and Mobivity used, are using, and inevitably will continue to use mGage's trade secrets in violation of the Restrictive Covenant Agreements unless enjoined.

121.    The Defendants' actions described herein constitute the willful misappropriation of mGage's trade secrets under New York law.

122.    The Defendants' misappropriation of mGage's trade secrets is causing, and threatens to continue causing, mGage to suffer irreparable harm, including but not limited to loss of clients, loss of reputation and customer goodwill, and loss of its investment in its trade secrets. This harm cannot be adequately remedied at law and requires permanent injunctive relief.

28

123.    mGage is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs, and expenses.

124.    Accordingly, mGage demands judgment against the Defendants for compensatory damages, permanent injunctive relief, prejudgment interest, an award to mGage of reasonable attorneys' fees, and costs pursuant to the Restrictive Covenant Agreements as well as New York law, and such other relief as the Court deems just and proper.

**COUNT III**
**Breach of Contract**
**(Against Defendant Glenn Stansbury)**

125.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 124 above as if fully set forth herein.

126.    As a condition of his employment with mGage, and for valuable consideration, Stansbury entered into the Stansbury Agreement, which contains several restrictive covenants, including the Non-Competition, Non-Solicitation, and Confidentiality Provisions, as well as a Return of Materials Provision.

127.    mGage performed its obligations under the Stansbury Agreement.

128.    The restricted period for the Non-Competition and Non-Solicitation Provisions for Stansbury will end on June 1, 2019, six months after his termination date (the "Stansbury Restricted Period").   mGage has not received the benefit of these provisions by virtue of Stansbury's breaches and his misappropriation of mGage's Confidential Information during the Stansbury Restricted Period.  mGage was unaware of and had no reason to suspect that Stansbury breached the Stansbury Agreement because Stansbury engaged in deceptive practices to hide his breaches of the Stansbury Agreement from mGage during the Stansbury Restricted Period.  As a result of Stansbury's breaches and deceptive conduct, mGage is entitled to an extension of the the

29

Non-Competition and Non-Solicitation Provisions in the Stansbury Agreement beginning from the date that an order issuing the preliminary injunction is filed.

129.   Stansbury has breached the Stansbury Agreement by, among other things: (i) working for Mobivity, (ii) upon information and belief, soliciting employees and clients or customers of mGage on behalf of Mobivity and (iii) using, disclosing, and retaining mGage's confidential business information.

130.   As a result of Stansbury's actions in violation of the Stansbury Agreement, mGage has suffered, and continues to suffer, substantial and irreparable injury.

131.   Stansbury's continuing actions in violation of the Stansbury Agreement expose mGage to a pending and ongoing threat of immediate and irreparable harm.

132.   Stansbury agreed, in writing, that mGage would suffer irreparable harm as a result of any actions taken by him in violation of the Stansbury Agreement, and that remedies at law would be inadequate.  Stansbury further acknowledged and agreed that mGage would be entitled to immediate injunctive relief and other equitable remedies in the event of his breach of the Stansbury Agreement.

133.   Because of Stansbury's multiple, willful, and malicious breaches of the Stansbury Agreement, mGage demands judgment against him for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT IV**
**Breach of Contract**
**(Against Defendant Tracey Dreby)**

134.   mGage adopts and realleges the allegations contained in Paragraphs 1 – 134 above as if fully set forth herein.

135.    As a condition of her employment with mGage, and for valuable consideration, Dreby entered into the Dreby Agreement, which contains several restrictive covenants, including the Non-Competition, Non-Solicitation, and Confidentiality Provisions, as well as a Return of Materials Provision.

136.    mGage performed its obligations under the Dreby Agreement.

137.    Dreby has breached the Dreby Agreement by, among other things: (i) working for Mobivity, (ii) upon information and belief, soliciting employees and clients or customers of mGage on behalf of Mobivity, and (iii) using, disclosing, and retaining mGage's confidential business information.

138.    The restricted period for the Non-Competition and Non-Solicitation Provisions for Dreby will end on June 1, 2019, six months after her termination date (the "Dreby Restricted Period").   mGage has not received the benefit of the Non-Competition and Non-Solicitation Provisions by virtue of Dreby's breaches and misappropriation of mGage's Confidential Information during the Dreby Restricted Period.   mGage was unaware of and had no reason to suspect that Dreby breached the Dreby Agreement because Dreby engaged in deceptive practices to hide her breaches of the Dreby Agreement from mGage during the Dreby Restricted Period.   As a result of Dreby's breaches and deceptive conduct, mGage is entitled to an extension of the Non-Competition and Non-Solicitation Provisions in the Dreby Agreement beginning from the date that an order issuing the preliminary injunction is filed.

139.    As a result of Dreby's actions in violation of the Dreby Agreement, mGage has suffered, and continues to suffer, substantial and irreparable injury.

140.    Dreby's continuing actions in violation of the Dreby Agreement expose mGage to a pending and ongoing threat of immediate and irreparable harm.

141.    Dreby agreed, in writing, that mGage would suffer irreparable harm as a result of any actions taken by her in violation of the Dreby Agreement, and that remedies at law would be inadequate.  Dreby further acknowledged and agreed that mGage would be entitled to immediate injunctive relief and other equitable remedies in the event of her breach of the Dreby Agreement.

142.    Because of Dreby's multiple, willful, and malicious breaches of the Dreby Agreement, mGage demands judgment against her for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

### COUNT V
### Breach of Contract
### (Against Defendant Darren Metzger)

143.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 142 above as if fully set forth herein.

144.    As a condition of his employment with mGage, and for valuable consideration, Metzger entered into the Metzger Agreement, which contains several restrictive covenants, including the Non-Competition, Non-Solicitation, and Confidentiality Provisions, as well as a Return of Materials Provision.

145.    mGage performed its obligations under the Metzger Agreement.

146.    The restricted period for the Non-Competition and Non-Solicitation Provisions for Metzger will end on May 5, 2019, six months after his termination date (the "Metzger Restricted Period").  mGage has not received the benefit of the Non-Competition and Non-Solicitation Provisions by virtue of Metzger's breaches and misappropriation of mGage's Confidential Information during the Metzger Restricted Period.  mGage was unaware of and had no reason to suspect that Metzger breached the Metzger Agreement because Metzger engaged in deceptive

32

practices to hide his breaches of the Metzger Agreement from mGage during the Metzger Restricted Period.  As a result of Metzger's breaches and deceptive conduct, mGage is entitled to an extension of the Non-Competition and Non-Solicitation Provisions in the Metzger Agreement beginning from the date that an order issuing the preliminary injunction is filed.

147.    Metzger has breached the Metzger Agreement by, among other things: (i) working for Mobivity, (ii) upon information and belief, soliciting employees and clients or customers of mGage on behalf of Mobivity, and (iii) using, disclosing, and retaining mGage's confidential business information.

148.    As a result of the Metzger's actions in violation of the Metzger Agreement, mGage has suffered, and continues to suffer, substantial and irreparable injury.

149.    Metzger's continuing actions in violation of the Metzger Agreement expose mGage to a pending and ongoing threat of immediate and irreparable harm.

150.    Metzger agreed, in writing, that mGage would suffer irreparable harm as a result of any actions taken by him in violation of the Metzger Agreement, and that remedies at law would be inadequate.  Metzger further acknowledged and agreed that mGage would be entitled to immediate injunctive relief and other equitable remedies in the event of his breach of the Metzger Agreement.

151.    Because of Metzger's multiple, willful, and malicious breaches of the Metzger Agreement, mGage demands judgment against him for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## COUNT VI
## Breach of Contract
## (Against Defendant Robert Merkin)

152.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 150 above as if fully set forth herein.

153.    As a condition of his employment with mGage, and for valuable consideration, Merkin entered into the Merkin Agreement, which contains several restrictive covenants, including the Non-Competition, Non-Solicitation, and Confidentiality Provisions, as well as a Return of Materials Provision.

154.    mGage performed its obligations under the Merkin Agreement.

155.    The restricted period for the Non-Competition and Non-Solicitation Provisions for Merkin will end on May 6, 2019, six months after his termination date (the "Merkin Restricted Period").   mGage has not received the benefit of the Non-Competition and Non-Solicitation Provisions by virtue of Merkin's breaches and misappropriation of mGage's Confidential Information during the Merkin Restricted Period.   mGage was unaware of and had no reason to suspect that Merkin breached the Merkin Agreement because Merkin engaged in deceptive practices to hide his breaches of the Merkin Agreement from mGage during the Merkin Restricted Period.   As a result of Merkin's breaches and deceptive conduct, mGage is entitled to an extension of the Non-Competition and Non-Solicitation Provisions in the Merkin Agreement beginning from the date that an order issuing the preliminary injunction is filed.

156.    Merkin has breached the Merkin Agreement by, among other things: (i) working for Mobivity, (ii) upon information and belief, soliciting employees and clients or customers of mGage on behalf of Mobivity, and (iii) using, disclosing, and retaining mGage's confidential business information.

157.    As a result of Merkin's actions in violation of the Merkin Agreement, mGage has suffered, and continues to suffer, substantial and irreparable injury.

158.    Merkin's continuing actions in violation of the Merkin Agreement expose mGage to a pending and ongoing threat of immediate and irreparable harm.

159.    Merkin agreed, in writing, that mGage would suffer irreparable harm as a result of any actions taken by him in violation of the Merkin Agreement, and that remedies at law would be inadequate.  Merkin further acknowledged and agreed that mGage would be entitled to immediate injunctive relief and other equitable remedies in the event of his breach of the Merkin Agreement.

160.    Because of Merkin's multiple, willful, and malicious breaches of the Merkin Agreement, mGage demands judgment against him for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT VII**
**Breach of Contract**
**(Against Defendant Ronald Sulak)**

161.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 160 above as if fully set forth herein.

162.    As a condition of his employment with mGage, and for valuable consideration, Sulak entered into the Sulak Agreement, which contains several restrictive covenants, including the Non-Solicitation and Confidentiality Provisions, as well as a Return of Materials Provision.

163.    mGage performed its obligations under the Sulak Agreement.

164.    mGage terminated Sulak's employment on August 3, 2018.

165.    On or about August 3, 2018, mGage and Sulak entered into a written separation agreement in which mGage agreed to pay Sulak two weeks of severance pay.  mGage agreed to waive the Non-Competition Provision with respect to Sulak.  Sulak, however, agreed that that Non-Solicitation, Confidentiality, and Return of Materials Provision of the Sulak Agreement remained in effect.

166.    Sulak has breached the Sulak Agreement by, among other things: (i) upon information and belief, soliciting clients or customers of mGage on behalf of Mobivity and (ii) using, disclosing, and retaining mGage's confidential business information.

167.    The restricted period for the Non-Solicitation Provision for Sulak ended on February 3, 2019, six months after his termination date (the "Sulak Restricted Period").  mGage has not received the benefit of the Non-Solicitation Period by virtue of Sulak's breaches and misappropriation of mGage's Confidential Information during the Sulak Restricted Period. mGage was unaware of and had no reason to suspect that Sulak breached the Sulak Agreement because Sulak engaged in deceptive practices to hide his breaches of the Sulak Agreement from mGage during the Sulak Restricted Period.  As a result of Sulak's breaches and deceptive conduct, mGage is entitled to an extension of the Non-Solicitation Provision in the Sulak Agreement beginning from the date that an order issuing the preliminary injunction is filed.

168.    As a result of Sulak's actions in violation of the Sulak Agreement, mGage has suffered, and continues to suffer, substantial and irreparable injury.

169.    Sulak's continuing actions in violation of the Sulak Agreement expose mGage to a pending and ongoing threat of immediate and irreparable harm.

170.    Sulak agreed, in writing, that mGage would suffer irreparable harm as a result of any actions taken by him in violation of the Sulak Agreement, and that remedies at law would be

inadequate.  Sulak further acknowledged and agreed that mGage would be entitled to immediate injunctive relief and other equitable remedies in the event of his breach of the Sulak Agreements.

171.    Because of Sulak's multiple, willful, and malicious breaches of the Sulak Agreement, mGage demands judgment against him for compensatory damages, injunctive relief, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

### COUNT VIII
### Breach of the Fiduciary Duty of Loyalty
### (Against Defendant Glenn Stansbury )

172.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 171 above as if fully set forth herein.

173.    At all relevant times hereto, Stansbury, as an employee and Vice President at mGage, had fiduciary duties and a duty of loyalty to mGage.

174.    Stansbury breached his respective fiduciary duty of loyalty to mGage by, among other things, (i) misappropriating mGage's confidential, proprietary and/or trade secret information while he was still employed by mGage for the purpose of using the information to compete with mGage in his new role at Mobivity; and (ii) soliciting mGage's employees to join a competitor while still employed by mGage,

175.    As a result of Stansbury's breach, mGage has suffered and will continue to suffer damages, including irreparable damages.

176.    mGage has been injured as a direct and proximate result of Stansbury's breach of his duty of loyalty to mGage and, thus, seeks monetary damages in an amount to be proven at trial, as well as injunctive relief against Stansbury to prevent further harm.

177.    Stansbury's actions were committed knowingly, willfully and in conscious disregard of mGage's fiduciary rights and right to loyalty from its employees.  Accordingly, mGage is entitled to recover punitive damages in an amount to be determined at trial.

**COUNT IX**
**Breach of the Fiduciary Duty of Loyalty**
**(Against Defendant Tracey Dreby)**

178.    mGage adopts and realleges the allegations contained in Paragraphs 1 – 177 above as if fully set forth herein.

179.    At all relevant times hereto, Dreby, as an employee and manager at mGage, had fiduciary duties and a duty of loyalty to mGage.

180.    Dreby breached her respective fiduciary duty of loyalty to mGage by, among other things, misappropriating mGage's confidential, proprietary, and/or trade secret information while she was still employed by mGage for the purpose of using the information to compete with mGage in her new role at Mobivity.

181.    As a result of Dreby's breach, mGage has suffered and will continue to suffer damages, including irreparable damages.

182.    mGage has been injured as a direct and proximate result of Dreby's breach of her duty of loyalty to mGage and, thus, seeks monetary damages in an amount to be proven at trial, as well as injunctive relief against Dreby to prevent further harm.

183.    Dreby's actions were committed knowingly, willfully, and in conscious disregard of mGage's fiduciary rights and right to loyalty from its employees.  Accordingly, mGage is entitled to recover punitive damages in an amount to be determined at trial.

## COUNT X
## Tortious Interference with Contract
## (Against Mobivity)

184.     mGage adopts and realleges the allegations contained in Paragraphs 1 – 183 above as if fully set forth herein.

185.     As described above, mGage entered into binding Restrictive Covenant Agreements with the Former Employees which contained certain restrictive covenants, including the Non-Competition clause, the Non-Solicitation covenant, and the Confidentiality Provisions.

186.     Mobivity knew that mGage and the Former Employees had a contractual relationship via the Restrictive Covenant Agreements, as well as the terms of the restrictive covenants contained therein.

187.     Despite having this knowledge, Mobivity knowingly, intentionally, and maliciously decided, endeavored, and sought to engage in acts which intended and did induce each of the Former Employees to breach, among other things, the Non-Solicitation, Non-Competition, and Confidentiality Provisions as well as, upon information and belief, the Return of Property Provisions.

188.     The improper conduct of Mobivity was committed with actual malice and ill will toward mGage, and with the intentional and improper purpose of causing irreparable damage.

189.     As a direct result of the willful and improper conduct of Mobivity, mGage has suffered and will suffer damages, including without limitation, losses of mGage's investment in the goodwill and relationships that mGage has built with its customers, as well as the investment it has made in the confidential and trade secret information misappropriated by the Former Employees for the benefit of Mobivity.

190.     Accordingly, mGage demands judgment against Mobivity for its tortious interference with the Former Employees' Restrictive Covenant Agreements in the form of compensatory and punitive damages, prejudgment interest, mGage's reasonable attorneys' fees and costs, and such other relief as the Court deems just and proper.

**COUNT XI**
**Preliminary and Permanent Injunction**
**(Against All Defendants)**

191.     mGage adopts and realleges the allegations contained in Paragraphs 1 – 190 above as if fully set forth herein.

192.     As set forth above in the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, the Former Employees materially breached their respective Restrictive Covenant Agreements with mGage.

193.     As set forth above in the Tenth Cause of Action, mGage knowingly and intentionally interfered with the Former Employees' contracts by, among other things, causing and inducing them to breach their restrictive covenants and misappropriate mGage's Confidential Information.

194.     As set forth above in the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, mGage has not received the benefit of the six month Non-Competition and Non-Solicitation Provisions in the Restrictive Covenants Agreements by virtue of the Former Employees' breaches and misappropriation of mGage's Confidential Information during and following the termination of their employment at mGage.  mGage was unaware of and had no reason to suspect that the Former Employees breached Restrictive Covenant Agreements because they engaged in deceptive practices to hide their breaches of their respective agreements.   As a result of the Former Employees' breaches and deceptive conduct, mGage is entitled to an extension of the Non-

Competition and Non-Solicitation Provisions in each of the Former Employees' Restrictive Covenant Agreements, beginning from the date that an order issuing the preliminary injunction is filed.

195.    mGage has a substantial likelihood of success on its claims of breach of contract and tortious interference with contract.

196.    By reason of the foregoing, mGage has been and is continuing to be irreparably harmed in that mGage's business is being injured, mGage is losing or is being threatened with the loss of resources, business, goodwill profits, confidential and proprietary information, and other harm, each of which cannot be adequately remedied by money damages because of, among other reasons, the difficulty of ascertaining the amount of such damages that have been and will be suffered by mGage.

197.    The balance of the equities favors mGage here because the Former Employees' restrictive covenants are reasonable and narrowly drawn to protect mGage's legitimate business interests and the Former Employees, at Mobivity's behest, have blatantly breached such restrictions.   Mobivity will suffer no harm if the Former Employees' are prevented from performing services for or on its behalf as it can utilize other employees to service its customers.

198.    By reason of the foregoing, mGage is entitled to an injunction:

1)   Enjoining Stansbury, Dreby, Metzger, and Merkin:

   a.   for a period of six (6) months from the date an order granting mGage's request for a preliminary injunction is issued, from directly or indirectly rendering services to, becoming employed by, having any equity interest in, or managing or operating any Competitive Entity, as defined in the Restrictive Covenant

Agreements and including Mobivity, in any area in which mGage or any of its subsidiaries or affiliates conducts business.

2) Enjoining the Former Employees:

   a. for a period of six (6) months from the date an order granting mGage's request for a preliminary injunction is issued, from soliciting, inducing, or otherwise encouraging for the purposes of employment, offering to hire, or employing any individual who is then (or at any time during the previous year, was) an employee of mGage or any of its subsidiaries or affiliates;

   b. for a period of six (6) months from the date an order granting mGage's request for a preliminary injunction is issued, from soliciting, inducing, or otherwise encouraging business from any supplier, customer or client served by the Former Employees in any fashion, either alone or jointly with others, during the Former's Employees employment with mGage; or

   c. for a period of six (6) months from the date an order granting mGage's request for a preliminary injunction is issued, from soliciting, inducing, or otherwise encouraging business from any person or entity that was, during the Former Employees' employment with mGage, solicited or identified as a business prospect by the Former Employee in any fashion, either alone or jointly with others.

3) Enjoining Mobivity:

   a. for a period of six (6) months from the date an order granting mGage's request for a preliminary injunction is issued, from directly or indirectly employing or

42

otherwise utilizing the services of the defendants Glenn Stansbury, Tracey Dreby, Darren Metzger, and Robert Merkin;

b. inducing, causing, instructing, or otherwise permitting the Former Employees to solicit, induce, or otherwise encourage, either directly or indirectly (i) any employee of mGage, its subsidiaries or affiliates, or who was employed by mGage, its subsidiaries or affiliates at any time during the previous year, (ii) any clients the Former Employees served at mGage in any fashion, either alone or jointly with others, or (iii) any person or entity that was, during the Former Employees' employment with mGage, solicited or identified as a business prospect by the Former Employees in any fashion, either alone or jointly with others.

4) Enjoining all Defendants:

a. from using, transferring, reproducing, sharing, revealing or otherwise disclosing any Confidential Information, proprietary or trade secret information of mGage or any customers of mGage, or any of its subsidiaries or affiliates Confidential Information, as it is defined in the Restrictive Covenant Agreements, including, but not limited to, mGage's client lists, client records, customer information, pricing information and methodology, sales and marketing, product research and development; and

b. from accessing, tampering with, purging, deleting or destroying any tangible or electronically stored information (i.e., whether in hard copy format or contained on computer equipment, electronic storage media, or webmail accounts), which is in their possession, custody or control and which relates in any way to

mGage, to any information obtained from mGage, or to their efforts to compete with mGage.

199.    By reason of the foregoing, mGage is entitled to a preliminary injunction:

1)  Enjoining defendants Stansbury, Metzger, Merkin, and Dreby:

   a.   from directly or indirectly rendering services to, becoming employed by, having any equity interest in, or managing or operating any Competitive Entity, as defined in the Restrictive Covenant Agreements, in any area in which mGage or any of its subsidiaries or affiliates conducts business.

2)  Enjoining the Former Employees:

   a.   from soliciting, inducing, or otherwise encouraging for the purposes of employment, offering to hire or employing any individual who is then (or at any time during the previous year, was) an employee of mGage or any of its subsidiaries or affiliates;

   b.   from soliciting, inducing, or otherwise encouraging business from any supplier, customer or client served by the Former Employees in any fashion, either alone or jointly with others, during the Former's Employees employment with mGage; and

   c.   from soliciting, inducing, or otherwise encouraging business from any person or entity that was, during the Former Employees' employment with mGage, solicited or identified as a business prospect by the Former Employee in any fashion, either alone or jointly with others.

3) Enjoining Mobivity:

    a. from directly or indirectly employing or otherwise utilizing the services of the Former Employees; and

    b. from inducing, causing, instructing, or otherwise permitting the Former Employees to solicit, induce, or otherwise encourage, either directly or indirectly (i) any employee of mGage, its subsidiaries or affiliates, or who was employed by mGage, its subsidiaries or affiliates at any time during the previous year, (ii) any clients the Former Employees served at mGage in any fashion, either alone or jointly with others, or (iii) any person or entity that was, during the Former Employees' employment with mGage, solicited or identified as a business prospect by the Former Employees in any fashion, either alone or jointly with others.

4) Enjoining all Defendants:

    a. from using, transferring, reproducing, sharing, revealing or otherwise disclosing any Confidential Information, as defined in the Restrictive Covenant Agreements, proprietary or trade secret information of mGage or any customers of mGage, its subsidiaries or affiliates, including, but not limited to, mGage's client lists, client records, customer information, pricing information and methodology, sales and marketing, product research and development.

5) Ordering all Defendants:

    a. to return any and all information, files, property, and/or data obtained from mGage, or otherwise belonging to mGage within forty-eight (48) hours of the Court's order;

b.   engage in expedited discovery; and

c.   permit mGage to inspect and forensically image all personal and/or business mobile devices, email accounts, or computers used or accessed by the Former Employees since August 1, 2018.

200.   mGage has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, mGage respectfully demands that judgment be made and entered in its favor and against the Former Employees and Mobivity as follows:

(a)   Enter an Preliminary Injunction enjoining the Former Employees as follows:

(i)   From possessing any mGage trade secrets or Confidential Information;

(ii)   From directly or indirectly disclosing, disseminating or revealing any Confidential Information to any third-party, including Mobivity;

(iii)   From either directly or indirectly rendering services to, being employed by, having any equity interest in, or managing or operating any Competitive Entity, including Mobivity, during the non-competition period (except for Sulak);

(iv)   From soliciting, directly or indirectly, on his or her own behalf or on behalf of any other person or entity, including Mobivity, any employee, customer, subscriber or supplier of mGage or any of its subsidiaries or affiliates;

(v)   From soliciting business from any supplier, customer or client served by the Former Employees while working at mGage in any fashion, either alone or jointly with others, during the Former employee's employment with mGage;

46

(vi)    From soliciting business from any Person that was, during the Former Employee's employment with mGage, solicited or identified as a business prospect by the Former Employee in any fashion, either alone or jointly with others;

(vii)    With respect to Mobivity, from inducing, causing, instructing, or otherwise permitting the Former Employees to violate the Restrictive Covenant Agreements;

(viii)    And, ordering all Defendants to return any and all information, files, property, and/or data misappropriated from, or otherwise belonging to mGage within forty-eight (48) hours of the Court's order, and engage in expedited discovery and permit mGage to inspect and forensically examine and image all  personal and/or business mobile devices, email accounts, or computers used or accessed by the Former Employees since August 1, 2018.

(b)    Award mGage damages in an amount to be determined at trial for the Former Employees' breaches of the Restrictive Covenant Agreements;

(c)    Award mGage damages in an amount to be determined at trial for Dreby's and Stansbury's breaches of their duties of loyalty to mGage;

(d)    Award mGage the return of compensation paid to Dreby and Stansbury during their period of disloyalty in an amount to be determined at trial;

(e)    Require the Former Employees to account to mGage for all revenues and profits derived from their misappropriation of mGage's trade secrets;

(f)    Require Mobivity to account to mGage for all revenues and profits derived from the Former Employee's misappropriation of mGage's trade secrets for the benefit of Mobivity;

(g)    Award mGage actual, liquidated, and/or compensatory damages in an amount to be determined at trial against the Former Employees for their misappropriation of mGage's trade secrets;

(h)    Award mGage exemplary damages pursuant to (i) the DTSA, (ii) New York state law due to the Former Employees' willful and malicious misappropriation of mGage's trade secrets, and (iii) New York state law due to Stansbury's and Dreby's willful conscious disregard of mGage's fiduciary rights and right to loyalty from its employees;

(i)    Award mGage actual, liquidated, and/or compensatory damages as well as punitive damages in an amount to be determined at trial against Mobivity for its tortious interference with the Former Employees' Restrictive Covenant Agreements;

(j)    Award mGage prejudgment interest against the Former Employees and Mobivity for the claims asserted against them herein;

(k)    Award mGage all costs and attorneys' fees it incurs in the prosecution of this lawsuit pursuant to both the Attorney Fees Provision of the Restrictive Covenant Agreements and relevant New York law and/or Georgia law; and

(l)    Award mGage such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, mGage demands trial by jury on all issues triable by jury.

DATED: February 7, 2019
        New York, New York

                  Respectfully submitted,

                  KASOWITZ BENSON TORRES LLP

                  By

                    Jessica T. Rosenberg
                    Melissa A. Barahona

                    1633 Broadway
                    New York, NY 10019
                    (212) 506-1700

                  *Attorneys for Plaintiff mGage, LLC*